

RODRIGO DECASAS
Patient No.: 1298-9
Coalinga State Hospital
P.O. Box 5003
Coalinga, CA 93210-5003

*Plaintiff in Pro Se*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

RODRIGO DECASAS,
*Plaintiff,*

Vs.

WONG, Supervising Deputy Los Angeles County
Public Defender,
*Defendant.*

Case No.: CV15-919 RT E

**Civil Rights Complaint Pursuant to
42 U.S.C. §1983 (non-prisoners)**

## I.  JURISDICTION

1. This court has jurisdiction under 28 U.S.C. §1331 and 28 U.S.C. §1343. Federal question jurisdiction arises pursuant to 42 U.S.C. §1983.

## II.  VENUE

2. Venue is proper pursuant to 28 U.S.C. §1391 (b) due to both the location of Defendant's office as well as the relevant behavior of Defendant, upon which this Complaint is based, having taken place within the Central District of California, namely in Los Angeles County.

3. Plaintiff is an illegal deportable alien seeking to return to his homeland of Mexico. He is presently a "patient" at Coalinga State Hospital, P.O. Box 5003, Coalinga, California 93210-5003.

4. Defendant was the direct supervisor of Plaintiff's attorney, a lawyer representing Plaintiff in a civil commitment proceeding pursuant to California's Welfare and Institutions Code §§ 6600, et seq. (herein 'SVPA'), within the Los Angeles County Public Defender's Office.

5. Defendant is sued in both Defendant's individual and official capacities.

6. Defendant was acting under color of law as Defendant was required, by virtue of Defendant's Los Angeles County government position, to properly supervise and train Plaintiff's appointed counsel to ensure such appointed counsel effectively represented Plaintiff during the period said appointed counsel had been ordered by the California Superior Court (County of Los Angeles), pursuant to the SVPA proceedings, to effectively represent Plaintiff in said proceedings.

## III. STATEMENT OF FACTS

**(a) Period of Defendant's Supervision of Plaintiff's Appointed Counsel**

CIVIL RIGHTS COMPLAINT

10. The California Department of State Hospitals[1] (herein "DSH") oversaw and conducted an "assessment" of Plaintiff to ostensibly determine whether Plaintiff was subject to SVPA civil commitment.

11. The Los Angeles County District Attorney claimed the State of California had jurisdiction over Plaintiff and prohibited Plaintiff from returning to his homeland by filing a petition, pursuant to the SVPA, in the California Superior Court (County of Los Angeles) contending that Plaintiff required mental health treatment and that such treatment needed to be within an inpatient setting due to Plaintiff' suffered from a paraphilia that caused such volitional impairment in Plaintiff that he was "likely" to commit sexually violent predatorial offenses if he were released into the community irrespective of whether he were to be adequately supervised within the community.

12. The California Superior Court (County of Los Angeles) appointed counsel, from the Los Angeles County Public Defender's Office, to represent Plaintiff in the SVPA action. Said counsel was directly supervised by Defendant, a supervising deputy Public Defender of the Los Angeles County Public Defender's Office.

13. Plaintiff remains subject to the SVPA and is presently prohibited from taking part in outpatient treatment.

**(b) Defendant's Failure to Adequately Train and Otherwise Supervise Plaintiff's Appointed Counsel**

14. Defendant was aware that the SVPA was being implemented in a manner that violated Plaintiff's Fourteenth Amendment Substantive Due Process Rights, Procedural Due Process Rights and Equal Protection Rights due to a fraudulent assessment scheme, yet failed to either train Plaintiff's counsel to (i) adequately investigate such fraudulent assessment scheme and (ii) prepare a motion to dismiss the SVPA action in light of the above-noted Fourteenth Amendment violations which resulted from the fraudulent assessment scheme.

15. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 1999 to the time Defendant was supervising Plaintiff's appointed counsel, agents of the DSH created and acquiesced to policies and customs that caused hundreds of individuals, including Plaintiff, to (i) be subjected to conditions that were excessively restrictive in relation to the purported purposes of the Sexually Violent Predator Act (herein 'SVPA') and (ii) be irrationally denied the substantive benefits of outpatient treatment. Defendant was aware that from any pre-trial period that the DSH accepted Plaintiff into their custody, that the DSH were deliberately prohibiting Plaintiff from taking part in outpatient treatment from that point to present, despite knowing that Plaintiff would (i) be subjected to conditions that were excessively restrictive in relation to the purported purposes of the Sexually Violent Predator Act (herein 'SVPA') and (ii) be irrationally denied the substantive benefits of outpatient treatment.

16. The evidence of such facts are the existence of data, within the public domain, which Defendants had knowledge of during the period Defendant supervised Plaintiff's appointed

---

[1] Prior to, or about, 2009 the California Department of Mental Health was the agency tasked with the duties and functions noted herein until, at such time onwards, said California Government Agency was dissolved and its duties and functions came under the jurisdiction of the California State Hospitals. Consequently, for the purposes of clarification any use of California State Hospitals is intended, for the purposes of this complaint, to refer to the California Department of Mental Health *prior* to its dissolution and California State Hospitals from the period the California Department of Mental Health had been dissolved onwards.

CIVIL RIGHTS COMPLAINT

counsel, which demonstrated that agents of the DSH were fraudulently purporting to have rationally "assessed" Plaintiff despite Defendants' awareness, in light of such facts, that such assessments were irrational. Defendant was aware that such "assessments" were deemed by agents of the DSH to be capable of indentifying individuals who were "likely" to commit "sexually violent predatorial" offenses if released into outpatient treatment programs irrespective of whether they were supervised in the community despite the DSH agents' awareness that such "assessments" were so irrational that any of their results could not be deemed even remotely accurate nor reliable.

17. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that when Plaintiff was "evaluated" by an agent of the DSH, said agent had been directed by the DSH to (i) follow a policy which required DSH "evaluators" to misdiagnose individuals as suffering from paraphilias despite the DSH knowing that said "evaluators" had not properly assessed such individuals for such mental conditions, (ii) follow a policy which required DSH "evaluators" to fraudulently purport to possess actuarial tools that could accurately identify those individuals who were "likely" to reoffend (when the DSH possessed data that confirmed otherwise), and (iii) follow a policy which required said DSH "evaluators" to misuse the above-noted assessment tools to *even further* skew the projected "likelihood" of an individual reoffending by using dramatically higher than accurate (for either the United States or the State of California) sex offender recidivism "base rates" and "groupings".

18. These three methodologies shall be referred to herein as the "Assessment Fraud Scheme".

*(i) Fraudulent Purporting to Have Rationally Diagnosed Individuals with Paraphilias*

19. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that although California Government Code Section 11340.5 explicitly indicates that no state agency shall issue, utilize, enforce, or attempt to enforce any guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule, which is a regulation as defined in Section 1134.600, unless the guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule has been adopted as a regulation and filed with the Secretary of State pursuant to this chapter, the DSH nonetheless subjected individuals "assessed" pursuant to the SVPA, prior to or about 2006, "assessments" that followed a protocol that failed to comply with Section 11340.5.

20. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that on, or about, 2006 the DSH published its SVPA "assessment protocol" indicating that Plaintiff, as well as all individuals initially screened to determine whether they are subject to SVPA adjudication, must have been "assessed" to determine whether Plaintiff has a diagnosed mental disorder that predisposes the person to the commission of criminal sexual acts. The "assessment protocol" stated that in diagnosing such a mental disorder the strongest predictor variable, in a study the "assessment protocol" stated was relied upon in its formulation, is sexual arousal as measured by phalometric assessment (Assessment Protocol, Page 16).

21. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that phalometric assessments are the *only* known means of accurately diagnosing a paraphilia.

22. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that the psychiatric profession has determined that the *majority* (thus over 50%) of individuals,

CIVIL RIGHTS COMPLAINT

who have committed sex offenses, are individuals who do *not* suffer from *any* form of paraphilia[2].

23. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from the inception of the SVPA (on or about 1996) through the period the above-noted assessment protocol was published (on or about 2006) to the time of Plaintiff's SVPA trial, the DSH has systematically refused to follow (including with Plaintiff) its own "assessment protocol", for diagnosing mental disorders that predisposes the individual to the commission of criminal sexual acts, by failing to conduct *any* phalometric assessments of individuals who were "evaluated" to determine whether they are subject to SVPA adjudication. Further, despite (i) such non-performed phalometric assessments being the *only* known means of appropriately diagnosing a paraphilia and (ii) the psychiatric profession having determined that the *majority* (thus over 50%) of individuals, who have committed sex crimes, are individuals who do *not* suffer from *any* form of paraphilia[3], the DSH systematically ensure that *all* those "assessed", pursuant to the SVPA, were diagnosed as suffering from a paraphilia.

*(ii) Fraudulent Purporting to Have Rational Actuarial Tools*

24. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that within the above-noted DSH published SVPA "assessment protocol" was stated that "actuarial tools" were to be used and that in deciding what base rate to use the DSH evaluator must note "that the base rate provided by the Static-99 is an underestimate of the individual's true risk". (Assessment Protocol, Pages 28-29)

25. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 1999 to the time of Plaintiff's trial, numerous studies were done to quantify the accuracy of the actuarial tools, used by the State of California to "assess" individuals suspected of being subject to SVPA commitment. The mechanism for doing so was through the use of "receiver operator characteristics" (herein "ROC") which enables the quantification of "true positives" (namely, those individuals who will reoffend who were correctly identified by the instrument) and "false positives" (namely, those who will not reoffend, who were misclassified by the instrument). A ROC score ranges from 0.0 (never accurate) to 1.0 (perfect accuracy). The ROC method allows the accuracy of instruments to be compared even if the instruments were developed with different base rates (namely, different than the group of individuals upon which the instrument was developed). (Grant T. Harris, et al, "A Multisite Comparison of Actuarial Risk Instruments for Sex Offenders", 15(3) Psychological Assessment 413 (2003)[4]).

26. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that the ROC method, of assessing actuarial tools' accuracies are both accepted, as well as used, by the authors of the actuarial tools used by the State of California in conducting its SVPA "assessments". (R Karl Hanson, et al., "STATIC-99: Improving Actuarial Risk

---

[2] American Psychiatric Association, "Dangerous Sex Offenders: A Task Force Report of the American Psychiatric Association", 1999, Washington, D.C.: American Psychiatric Association; Kaplan, B.J. and Sadock, V.A., "Comprehensive Textbook of Psychiatry", pp. 1965-1979, 2005, Philadelphia, PA: Lippincott, Williams & Wilkins.

[3] American Psychiatric Association, "Dangerous Sex Offenders: A Task Force Report of the American Psychiatric Association", 1999, Washington, D.C.: American Psychiatric Association; Kaplan, B.J. and Sadock, V.A., "Comprehensive Textbook of Psychiatry", pp. 1965-1979, 2005, Philadelphia, PA: Lippincott, Williams & Wilkins.

[4] All of the Reports and Studies noted within this complaint are a matter of public record and further most have been filed as Exhibits, in support of a similar Complaint, in the case of *Aaron Klein, v. Audrey King, et al.*, within the United States District Court, Eastern District of California with case number: 1:12-cv-01440 DLB PC.

CIVIL RIGHTS COMPLAINT

Assessments for Sex Offenders (User Report No. 199-02)", Ottawa: Department of the Solicitor General of Canada, 1999.)

27. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 1999 to the time of Plaintiff's trial numerous studies identified the ROCs of the actuarial tools used by the State of California in conducting its SVPA "assessments" and provided scores ranging from 0.54-0.73 for these tools. (R Karl Hanson, et al., "STATIC-99: Improving Actuarial Risk Assessments for Sex Offenders (User Report No. 199-02)", Ottawa: Department of the Solicitor General of Canada, (1999); Kevin L Nunes, et al., "A Comparison of Modified Versions of the STATIC-99 and Sex Offender Risk Appraisal Guide", 14 Sexual Abuse: J. Res. & Treatment 253, 265, (2002); Grant T. Harris, et al., "A Multistate Comparison of Actuarial Risk Instruments for Sex Offenders", 15(3) Psychological Assessment 413 (2003))

28. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 1999 to the time of Plaintiff's trial, agents of the DSH were aware of the United States sex offender recidivism data published by the United States Department of Justice (namely, U.S. Department of Justice, Bureau of Justice Statistics, Recidivism of Sex Offenders Released from Prison in 1994", November 2003, NCJ198281), and that considering such data, along with their actuarial tools' average ROCs of 0.70, these tools would incorrectly predict general sex offenders would recidivate approximately 90% of the time and sex offenders with child victims over 90% of the time. (A break down of the ROC analysis is contained within Tamara Lave, "Controlling Sexual Violent Predators: Continued Incarceration at What Costs?", New Criminal Law Review, Vol. 14 No. 2, pp. 213-280)

29. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 1999 to the time of Plaintiff's SVPA trial, despite the DSH being aware that the "assessment" tools resulted in 90% of those deemed to be prohibited from taking part in outpatient treatment, due to their erroneously having been deemed "likely" to reoffend if released into such programs, being irrationally deprived of the benefits of outpatient treatment, the DSH nonetheless deliberately directed, or acquiesced to, the use of such "assessment" tools.

*(iii) Use of Dramatically Higher Recidivism Base Rates and Groupings*

30. As noted above, during the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that within the above-noted DSH published SVPA "assessment protocol" was stated that "actuarial tools" were to be used and that in deciding what base rate to use the DSH evaluator must note "that the base rate provided by the Static-99 is an underestimate of the individual's true risk". (Assessment Protocol, Pages 28-29)

31. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from, or about, 2006 to the time of Plaintiff's SVPA trial, the DSH was aware of the fact that on, or about, 2006, Dr. Jesus Padilla, then a DSH employee, was instructed by the state to conduct a research project examining the recidivism rates of California's sex offenders.

32. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from, or about, 2006 to the time of Plaintiff's SVPA trial the DSH was aware that during the course of this study, Dr. Padilla reported that the recidivism rates for sex offenders was far lower than the state had purportedly "anticipated".

33. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from, or about, 2006 to the time of Plaintiff's SVPA trial the DHS' awareness of the data

CIVIL RIGHTS COMPLAINT

generated by Dr. Padilla caused the DSH to, rather than stay implementation of the SVPA until the Government of the State of California discovered a means of accurately identifying those individuals who had been convicted of sex offenses who were indeed "likely" to reoffend, continued to direct and acquiesce to the use of the above-noted actuarial tools.

34. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that on, or about, 2006, the DSH directed Dr. Padilla be removed from his position, within the government's sex offender program, in retaliation for Dr. Padilla having disclosed truthful California State recidivism data for individuals convicted of sex offenses that conflicted with the inaccurate data (which, when used in the actuarial tools the DSH directed and acquiesced to being used to "assess" individuals pursuant to the SVPA, dramatically increased the quantity of individuals prohibited from taking part in outpatient treatment) the DSH used to deliberately fraudulently inflate the quantity of individuals prohibited from taking part in outpatient treatment.

35. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from, or about, 2010 to the time of Plaintiff's SVPA trial the DSH was aware that both of the authors of the Static-99, an assessment tool used by the State of California pursuant to its SVPA to purportedly "assist" in determining the "likelihood" of reoffending for purposes of determining those prohibited from taking par in outpatient treatment, concluded "that recidivism rates in later data sets were significantly lower than in the original samples... that the revised version of the scale (Static-99R) replace Static-99 in all contexts where it is used... after it was recognized that sexual recidivism rates were much lower than in years past." ("Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny; page 152-153) Despite such evidence, the Defendants, in furtherance of their Assessment Fraud Scheme, continued to permit the Static-99 to be used to "assist" in determining the "likelihood" of reoffending for purposes of identifying those prohibited from taking part in outpatient treatment.

36. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from, or about, 2010 to the time of Plaintiff's SVPA trial the DSH was aware that the developers of the Static-99R, an assessment tool used by the Defendants, pursuant to the SVPA, to purportedly "assist" in determining the "likelihood" of reoffending for purposes of determining those prohibited from taking part in outpatient treatment, have indicated that "[t]o effectively use the Static-99R as an actuarial instrument, local norms[5] are recommended, but [ ] in most SVP cases[6], local norms are not available." ("Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny, page 157)

37. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2010 to the time of Plaintiff's SVPA trial the DSH was aware that the result of the facts, noted in above, is "a noteworthy score variation within each Static-99R reference group... For example, an evaluator who uses [one group] would find a predicted 5-year sexual recidivism rate of 8.7%... If, instead, she chose [another group], she would find a predicted 5-year sexual recidivism rate of 20.1% and a predicted 10-year sexual recidivism rate of 29.6%." ("Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny, page 156-157)

---

[5] Referring to each state's sex offender data.
[6] Including the State of California.

CIVIL RIGHTS COMPLAINT

38. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that despite such evidence, the DSH, in furtherance of their Assessment Fraud Scheme, directed and acquiesced to the use of dramatically higher recidivism rates than California's local norms when implementing the Static-99R, to "assist" in determining the "likelihood" of reoffending for purposes of identifying those prohibited from taking part in outpatient treatment.

39. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2010 to the time of Plaintiff's SVPA trial the DSH created and acquiesced to a policy or custom that permitted, despite the low recidivism rates California possessed from 2005 onwards, California's base rate, as used in the Static-99R assessment tool, to not be adjusted from the high recidivism base rate used to reflect the state's documented recidivism rates, for individuals who had been convicted of sexually violent predatorial offenses, committing new sexually violent predatorial offenses.

40. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2010 to the time of Plaintiff's SVPA trial the DSH, despite their awareness of the facts noted above, created and acquiesced to a policy or custom that permitted false base rates, that said defendants knew were dramatically higher than the accurate base rates for the State of California, to be used in "assessing" individuals subjected to California's SVPA, to deliberately cause the overwhelming majority of individuals prohibited from taking part in outpatient treatment to be  individuals who would have been permitted to take part in outpatient treatment had the correct base rate been used.

41. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from, or about, 2005 to the time of Plaintiff's SVPA trial the DSH were aware that the authors of the Static-99 and Static-99R, assessment tools used by the State of California to "assist" in California determining the "likelihood" of reoffending, for purposes of determining those subject to SVPA commitment, created the "High-Risk/Needs" group, used by California evaluators to "assist" in California determining the "likelihood" of reoffending for purposes of determining those prohibited from taking part in outpatient treatment, based on data from the 1960s to the 1980s when "[i]n fact, between 1990 and 2004, there was a 49 percent decline in observable sexual abuse." ("Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny, page 159)

42. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2005 to the time of Plaintiff's SVPA trial the DSH despite their awareness of the facts noted above, created and acquiesced to a policy or custom that permitted false base rates, that said defendants knew were dramatically higher than the accurate base rates for the State of California, to be used in "assessing" individuals subjected to California's SVPA, to deliberately cause the overwhelming majority of individuals prohibited from taking part in outpatient treatment to be  individuals who would have been permitted to take part in outpatient treatment had the correct base rate been used.

43. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from, or about, 2005 to the time of Plaintiff's SVPA trial the DSH, despite their awareness of the facts noted above, created and acquiesced to, a policy or custom that permitted those agents of the state, used to determine whether an individual may be prohibited from taking part in outpatient treatment, to use actuarial instruments in a manner contrary to that which was recommended by their creators – where the correct manner would create a far more accurate assessment of risk.

CIVIL RIGHTS COMPLAINT

44. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from, or about, 2005 to the time of Plaintiff's SVPA trial the DSH were aware that they had created, or acquiesced to, a process that caused over 90% of the individuals, who would otherwise be permitted to take part in outpatient treatment, to be erroneously deprived of the substantial benefits of such outpatient treatment. ("High Risk Sex Offenders May Not Be High Risk Forever", R. Karl Hanson, et al., *Journal of Interpersonal Violence*, November 3, 2013 & "Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny, pages 155-163[7])

45. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that on, or about, July 2011 the California State Auditor published a report indicating that of the 13,512 individuals who had been released from California's prisons, who had committed sexually violent predatorial offenses between 2005 to July 2011, only one such individual, therefore 0.000074%, "was later convicted of a sexually violent offense during the nearly six-year period we reviewed." ("Sex Offender Commitment Program, Streamlining the Process for Identifying Potential Sexually Violent Predators Would Reduce Unnecessary or Duplicate Work", California State Auditor, July 2011, page 17)

46. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2011 to the time of Plaintiff's trial the DSH was aware that the most recent California State recidivism data, for individuals who had been convicted of sex offenses and released from prisons (as published in the report "Sex Offender Commitment Program, Streamlining the Process for Identifying Potential Sexually Violent Predators Would Reduce Unnecessary or Duplicate Work", California State Auditor, July 2011) was approximately 0.000074%.

47. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2011 to the time of Plaintiff's trial the DSH created and acquiesced to a policy or custom that permitted those "evaluated", pursuant to California's SVPA, to have "base rates" and "groupings" used during such "evaluations" that the DSH knew were dramatically higher than 0.000074% despite the DSH being aware that the use of such erroneous "base rates" and "groupings" would dramatically erroneously increase the projected probability of those subject to such "evaluations", including but not limited to Plaintiff, being deemed "likely" to reoffend if released into outpatient treatment programs.

48. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from, or about, 2011 to the time of Plaintiff's trial the DSH were aware of the data which indicated that the "likelihood" of a high-risk sex offender committing a sex offense if released into the community declines significantly when such individuals are adequately supervised within the community. During the period Defendant supervised Plaintiff's appointed counsel

---

[7] Despite Dr. Hanson, one of the developers of the STATIC-99, having indicated that its results are not reliable due to its inability to effectively consider the significant effect of the ex-offender having not committed a sex crime while within the community, the State of California continues to permit such tool to be used. ("High Risk Sex Offenders May Not Be High Risk Forever", R. Karl Hanson, et al., Journal of Interpersonal Violence, November 3, 2013) Despite all of the developers of the STATIC-99R having indicated that the comparison group "High-Risk/Needs" comparison group has been deemed to have data culled when "sexual-recidivism rates were much higher than they are for sex offenders recently released from confinement in the USA" ("Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny, page 158), the State of California continues to refuse to use the appropriate groups nor base rates resulting in dramatically higher than valid predicted recidivism rates. The results of such flawed process is that 93.5% of those whom the state deemed were "likely" to commit sexually violent offenses if not imprisoned in an inpatient program were erroneously subjected to the deprivation of liberty caused by the SVPA.

CIVIL RIGHTS COMPLAINT

Defendant was aware that, for example, the State of California possesses data that the "likelihood" of a high-risk sex offender committing a sex offense if released into the community, wherein such individuals are provided with Global Positioning System (GPS) monitoring, reduces by approximately 60%[8]. ("Monitoring High-Risk Sex Offenders With GPS Technology: An Evaluation of the California Supervision Program Final Report", Stephen V. Gies, et al., Development Services Group, Inc., by grant of the National Institute of Justice, Office of Justice Program, page 3-9)

49. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from, or about, 2011, despite the DSH's awareness of the facts, noted above, these defendants directed or acquiesced to "assessments" that did not adjust the predicted rates of reoffending, for those subject to SVPA "evaluations", to include the significant reductions attributable to such monitoring techniques in assessing their "likelihood" of reoffending if released into the community with supervision.

*(iv) Data Demonstrating Similarly Situated Individuals Could be Provided with Outpatient treatment*

50. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2010 to the time of Plaintiff's trial the DSH was aware that the State of Texas had demonstrated, through successfully implementing an entirely outpatient sexually violent predator commitment program for a period in excess of a decade wherein not one individual committed to its program committed a new sexually violent predatorial offense, that the least restrictive means of safely fulfilling the purposes of the SVPA is through outpatient treatment. ("Council on Sex Offender Treatment Civil Commitment of the Sexually Violent Predator – Inpatient vs. Outpatient SVP Civil Commitment", Texas Department of State Health Services, 2010)

51. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2010 to the time of Plaintiff's trial, despite the DSH having been aware of the data, noted above, these defendants refused to recommend that those patients, under their care pursuant to California's SVPA, be permitted to take part in outpatient treatment.

52. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2010 to the time of Plaintiff's trial the DSH was aware that the State of Maine possessed data demonstrating that those individuals within the State of Maine, who had committed sexually violent predatorial offenses and who were not subjected to restrictive inpatient California SVPA style "treatment" did *not* commit new sexually violent predatorial offenses at a rate significantly greater than sex offenders in general.

53. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2010 to the time of Plaintiff's trial despite the DSH having been aware of the data, noted above, these defendants refused to recommend that those patients, under their care pursuant to California's SVPA, be permitted to take part in outpatient treatment.

54. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2012 to the time of Plaintiff's trial the DSH was aware that the State of Florida possessed data demonstrating that those individuals within the State of Florida, who had committed sexually violent predatorial offenses and who were not subjected to restrictive

---

[8] Please see Page 3-9 of "Monitoring High-Risk Sex Offenders With GPS Technology: An Evaluation of the California Supervision Program", Stephen V. Gies, et al., 2012, National Institute of Justice, Office of Justice Programs, U.S. Department of Justice

CIVIL RIGHTS COMPLAINT

inpatient California SVPA style "treatment" did *not* commit new sexually violent predatory offenses at a rate significantly greater than sex offenders in general ("Comparing Sexual Offenders at the Regional Treatment Centre (Ontario) and the Florida Civil Commitment Center", Robin J. Wilson, et al., International Journal of Offender Therapy and Comparative Criminology, January 19, 2012, page 14[9]; "Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny, page 160)

55. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2012 to the time of Plaintiff's trial despite the DSH having been aware of the data, noted above, these DSH refused to recommend that those patients, under their care pursuant to California's SVPA, be permitted to take part in outpatient treatment.

56. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2012 to the time of Plaintiff's trial the DSH was aware that the State of Connecticut possessed data demonstrating that those individuals within the State of Connecticut, who had committed sexually violent predatorial offenses and who were not subjected to restrictive inpatient California SVPA style "treatment" did *not* commit new sexually violent predatory offenses at a rate significantly greater than sex offenders in general. ("Recidivism among sex offenders in Connecticut", State of Connecticut Office of Policy and Management Criminal Justice Policy & Planning Division, February 15, 2012., page 32[10]; "Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny, page 160)

57. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2012 to the time of Plaintiff's trial despite the DSH having been aware of the data, noted above, the DSH refused to recommend that those patients, under their care pursuant to California's SVPA, be permitted to take part in outpatient treatment.

*(v) Blatant Exposure of DSH's Assessment Fraud Scheme*

a. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 1999 to the time of Plaintiff's trial the DSH created and acquiesced to policies and customs that prohibited all of those patients, who entered into their custody pursuant to the

---

[9]"Current meta-analytic reviews suggest that the average sexual re-offense rate for all known sexual offenders, post criminal sanction, is approximately 13% to 15% over a follow-up period of approximately 5 years." ("Comparing Sexual Offenders at the Regional Treatment Centre (Ontario) and the Florida Civil Commitment Center", Robin J. Wilson, et al., International Journal of Offender Therapy and Comparative Criminology, January 19, 2012, page 5)

"Both samples [within 5.5% within Canada and 3.2% within the State of Florida's 'high-risk' sex offenders] are certainly reoffending sexually at rates considerably below rates projected by the Static-99 (26.2%) or Static-99R (20.1%) experience table using the 5-year logistic regression results." ("Comparing Sexual Offenders at the Regional Treatment Centre (Ontario) and the Florida Civil Commitment Center", Robin J. Wilson, et al., International Journal of Offender Therapy and Comparative Criminology, January 19, 2012, page 14)

"Given the currently available normative rates of sexual recidivism requirements... we believe that this approach may assist SVP jurisdictions in balancing the need for protection of community safety while maintaining offenders in less restrictive environments where appropriate." ("Comparing Sexual Offenders at the Regional Treatment Centre (Ontario) and the Florida Civil Commitment Center", Robin J. Wilson, et al., International Journal of Offender Therapy and Comparative Criminology, January 19, 2012, page 16)

[10] Despite actuarial tests, similar to those used for California's SVPA "civil commitment" scheme, indicating a class of sex offenders released from Connecticut prisons were "highest risk" of committing new sex offenders 0% of such "high risk" sex offender were convicted of new sex crimes and for the second highest risk level of such sex offenders released from Connecticut prisons, 3.5% were convicted of new sex crimes. ("Recidivism among sex offenders in Connecticut", State of Connecticut Office of Policy and Management Criminal Justice Policy & Planning Division, February 15, 2012, page 32)

CIVIL RIGHTS COMPLAINT

SVPA, to be assessed to determine whether they suffered from a paraphilia in the manner identified by the American Psychological Association, namely through: (i) the patient disclosing he suffers from a paraphilia in that he has intense sexual thoughts and fantasies of engaging in deviant sexual behavior, (ii) the patient demonstrating arousal when exposed to deviant sexual stimuli as measured during "phalometric testing" and (iii) the patient having been found to have had, for over a six month period, intense sexual thoughts and fantasies of engaging in deviant sexual behavior through a polygraph assessment.

b.   During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 1999 to the time Plaintiff had his SVPA trial the DSH directed and acquiesced to the treatment teams[11] of all of those patients who entered into their custody, pursuant to the SVPA, to deliberately disregard evidence that the patients within their case load had been erroneously deemed to (i) suffer from a paraphilia (whether "Paraphilia NOS", "Pedophilia" or any other paraphilia) and (ii) be unable to take part in outpatient treatment due to such patients being "likely" to reoffend if treated within the community irrespective of whether such patients were supervised within the community. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that such deliberately disregarded evidence included, but was not limited to, (i) evidence that patients had demonstrated they possessed the required skills, to properly remove their alleged "barriers to discharge", within less than six months of their admittance to the hospital, (ii) evidence that the required time frames, for patients' to be expected to be capable of taking part in outpatient treatment, was not within any of the hospitals' records, (iii) evidence that the patient was not being provided with a minimum of twenty hours per week of treatment (whether in a small groups setting or individual) designed to ensure that patients addressed their "barriers to discharge" within a specific projected time frame (iv) evidence that the required assessments, to "rule-out" the many causes of sex offending other than patients suffering from paraphilias, had not been performed within 60 days of the patients' admittance to the hospital, (v) evidence that the required assessments, to identify the existence of a paraphilia (as noted above), had not been done within 7 days of the patients' admittance to the hospital, and (vi) evidence that patients had been erroneously diagnosed with a paraphilia (whether "Paraphilia NOS", "Pedophilia" or another paraphilia) through patients having neither (a) disclosed they suffer from a paraphilia in that they have intense sexual thoughts and fantasies of engaging in deviant sexual behavior, nor (b) demonstrated arousal when exposed to deviant sexual stimuli as measured during "phalometric testing", nor (c) been found to have had, for over a six month period, intense sexual thoughts and fantasies of engaging in deviant sexual behavior through polygraph assessments nor (d) demonstrated, through recent overt acts, they have sexual thoughts and fantasies of engaging in deviant sexual behavior.

c.   During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 1999 to the time of Plaintiff's trial the DSH directed and acquiesced to, the removal from the hospital or the treatment teams, of patients who had entered DSH's custody pursuant to the SVPA, staff which refused to disregard the evidence noted above in 51.

d.   During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2012 to the time of Plaintiff's trial the DSH possessed data indicating that individuals, whom the State of California alleged were sexually violent predators subject to

---

[11] These are the individuals, employed by the State of California, which are tasked with optimizing their patients' recovery within the hospital. The members of include a psychiatrist, a psychologist, a rehabilitation therapist, a social worker, a registered nurse, a psychiatric nurse practitioner and a licensed psychiatric technician.

CIVIL RIGHTS COMPLAINT

SVPA commitment and who were nonetheless released into the community had an "observable sexual recidivism rate" of 6.5%. ("Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny, page 160)

54. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2012 to the time of Plaintiff's trial the DSH was aware, pursuant to the data noted above, that 93.5% of those alleged by California to be sexually violent predators (prohibited from taking part in outpatient treatment programs due to their being "likely" to reoffend if released into such programs) did *not* commit new sexually violent predatorial offenses and had thus said defendants had been erroneously seeking to deprive these individuals of the benefits of outpatient treatment.

55. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2012 to the time of Plaintiff's trial present the DSH possessed data indicating that those who have been conditionally released into the community, after having been committed under the SVPA, do *not* commit new sexually violent predatorial offenses at a rate greater than other individuals who had be convicted of sexually violent predatorial offences and not alleged by the state to be subject to SVPA commitment.

56. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from, or about, 2013 to the time of Plaintiff's trial the DSH was aware that a 2013 empirical evaluation of the data relevant to "sexually violent predators" throughout the United States, including in California, demonstrates that the assessment tools and methods, purported to be used to distinguish those who are "likely" to reoffend from those who are not, have systematically failed to do so. (Tamara Lave and Justin McCrary, "Do Sexually Violent Predator Laws Violate Double Jeopardy or Substantive Due Process? An Empirical Inquiry", Brooklyn Law Review, 2013)[12]

*(vi) Denial of Outpatient Treatment Benefits*

57. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2010 to the time of Plaintiff's trial the DSH was aware that outpatient treatment programs have been demonstrated to be far more effective at treating the mental disorders, of those who have committed sexually violent predatorial offences, than the inpatient scheme mandated by the SVPA. ("Council on Sex Offender Treatment Civil Commitment of the Sexually Violent Predator – Inpatient vs. Outpatient SVP Civil Commitment", Texas Department of State Health Services, 2010 & "High Risk Sex Offenders May Not Be High Risk Forever", R. Karl Hanson, et al., *Journal of Interpersonal Violence*, November 3, 2013[13])

58. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2010 to the time of Plaintiff's trial the DSH was aware that the benefits of such outpatient programs are not available for those that come under the SVPA's mandatory inpatient scheme.

---

[12]Tamara Lave and Justin McCrary, "Do Sexually Violent Predator Laws Violate Double Jeopardy or Substantive Due Process? An Empirical Inquiry", 78 Brooklyn Law Review, 1391, 1392 (2013).

[13] It has been demonstrated that the likelihood of a sex offender re-offending after 10 years within a community based program falls to the level of one who has never been convicted of a sex offense in his life – thus he is effectively "cured" of his mental disorder. Such a beneficial result is not evidenced by inpatient schemes such as that mandated by the SVPA. ("High Risk Sex Offenders May Not Be High Risk Forever", R. Karl Hanson, et al., Journal of Interpersonal Violence, November 3, 2013, page 12)

CIVIL RIGHTS COMPLAINT

59. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2010 to the time of Plaintiff's trial the DSH was aware that such benefits of outpatient treatment *are* available for a similarly situated group of individuals, namely those who have committed the exact same offenses and suffer from the exact same disorders but who have *not* been arbitrarily deemed by the DSH's Assessment Fraud Scheme to be unable to be safely treated within the community, despite there being no actuarial tool nor assessment means of even remotely accurately determining the likelihood of such an ex-offender being able to be safely treated within the community – thus any means used to distinguish who receives and does not receive such benefits is merely irrationally and arbitrarily decided. ("Council on Sex Offender Treatment Civil Commitment of the Sexually Violent Predator – Inpatient vs. Outpatient SVP Civil Commitment", Texas Department of State Health Services, 2010, "Council on Sex Offender Treatment Civil Commitment of the Sexually Violent Predator – Texas Supreme Court Decisions, 2010, "Comparing Sexual Offenders at the Regional Treatment Centre (Ontario) and the Florida Civil Commitment Center", Robin J. Wilson, et al., *International Journal of Offender Therapy and Comparative Criminology*, January 19, 2012, "Recidivism among sex offenders in Connecticut", State of Connecticut Office of Policy and Management Criminal Justice Policy & Planning Division, February 15, 2012, "Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny [14])

60. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2013 to the time of Plaintiff's trial the DSH was aware that such benefits of outpatient treatment have been deemed to effectively "cure" [15] sex offenders: Dr. Karl Hanson, one of the authors of multiple assessment tools used by the State of California to "assist" in California determining the "likelihood" of reoffending for purposes of determining those subject to SVPA commitment [16], re-evaluated the data used in creating such assessment tools.

61. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2013 to the time of Plaintiff's trial the DSH was aware that the re-evaluation, noted above, has demonstrated "that sexual offenders' risk of serious and persistent sexual crime decreased the longer they had been sex offense-free in the community.

62. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2013 to the time of Plaintiff's trial the DSH was aware that the pattern, noted above, was particularly evident for high risk sexual offenders, whose yearly recidivism rates declined from approximately 7% during the first calendar year, to less than 1% per year when they have been offence-free for 10 years or more.

63. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2013 to the time of Plaintiff's trial the DSH was aware that the facts, noted above, were found to indicate that intervention and monitoring resources should be concentrated in the first few years after release, with diminishing attention and concern for individuals who remain offence-free for substantial periods of time." ("High Risk Sex Offenders May Not Be High

---

[14] Each of these reports demonstrate that data from multiple states, including the State of California, demonstrate conclusively that the **overwhelming majority** (over 90% in most cases and approximately 94% in the State of California) of those whom, according to the actuarial data and evaluations mandated by the SVPA's assessment protocol, would be deemed "likely" to re-offend if treated within the community in fact *have not re-offended* upon their release into the community as had been predicted.
[15] "The term "cure" is used to refer to someone who is no more likely than a non-sex offender to commit a sexual offense.
[16] Namely, STATIC-99 and STATIC-99R.

CIVIL RIGHTS COMPLAINT

Risk Forever", R. Karl Hanson, et al., Journal of Interpersonal Violence, November 3, 2013: Page 12)

64. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that from 2013 to the time of Plaintiff's trial despite the DSH having been aware of the facts, noted above, the DSH directed and acquiesced to the author's tools not being used in a manner that adjusted its predicted recidivism rates to consider Dr. Hanson's findings. During the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that thus firstly, the DSH directed and acquiesced to those deemed subject to SVPA "assessments" *not* being provided with a process wherein the tools were used properly to evaluate their "likelihood" of re-offending and secondly, the DSH directed and acquiesced to the "assessment" method not being altered to incorporate Dr. Hanson's findings which demonstrated that *outpatient treatment*, within the community, results in a dramatic fall in the likelihood of re-offending that is not present when an such ex-sex-offenders are not provided with *in-community treatment*.

65. In addition to the Assessment fraud scheme, Defendant was aware that (i) statutory construction reveals the State of California's Legislature never intended the SVPA to be applied against Plaintiff; (ii) although Petitioner is similarly situated to deportable aliens convicted of *non-sexual* aggravated offenses, unlike such deportable aliens Petitioner was not permitted, upon completion of his prison sentences, to return to his homeland; (iii) the State of California lacked the mandated legitimate state interests to proceed with the SVPA against Plaintiff due to Plaintiff being an illegal deportable alien seeking to return to his homeland[17] and (iv) the ability for the SVPA to be construed as applying to illegal deportable aliens seeking to return to their homelands demonstrates the SVPA is facially overbroad.

*(vii) Summary of Above Facts*

66. Despite the facts, noted above relevant to the Assessment Fraud Scheme, indicating that during the period Defendant supervised Plaintiff's appointed counsel Defendant was aware that (i) the DSH was aware that they possessed no means of even remotely accurately identifying those individuals who are "likely" to commit sexually violent predatorial offenses with appropriate supervision, due to their suffering from a paraphilia that severely impaired their volitional control, if not "civilly committed" within an inpatient setting[18], (ii) the DSH systematically fraudulently purported that they *had* in fact properly identified such individuals and (iii) the

---

[17] A state has a "legitimate interest [in conducting civil commitment proceedings] under its parens patriae powers in providing care to its citizens who are unable because of emotional disorders to care for themselves [and] authority under its police powers to protect the community from the dangerous tendencies of some who are mentally ill." (*People v. McKee* (2010) 47 C[17]al. 4th 1172, 1188-1189; *Addington v. Texas*, 441 U.S. 418, 426) Plaintiff has conceded deportability and is willing to be escorted to his homeland by law enforcement officials.

[18] "Council on Sex Offender Treatment Civil Commitment of the Sexually Violent Predator – Inpatient vs. Outpatient SVP Civil Commitment", Texas Department of State Health Services, 2010, "Council on Sex Offender Treatment Civil Commitment of the Sexually Violent Predator – Texas Supreme Court Decisions, 2010, "Comparing Sexual Offenders at the Regional Treatment Centre (Ontario) and the Florida Civil Commitment Center", Robin J. Wilson, et al., *International Journal of Offender Therapy and Comparative Criminology*, January 19, 2012, "Recidivism among sex offenders in Connecticut", State of Connecticut Office of Policy and Management Criminal Justice Policy & Planning Division, February 15, 2012 and "Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny demonstrate that data from multiple states, including the State of California, demonstrate conclusively that the **overwhelming majority** (over 90% in most cases and approximately 94% in the State of California) of those whom, according to the actuarial data and evaluations mandated by the SVPA's assessment protocol, would be deemed "likely" to re-offend if treated within the community in fact *have not re-offended* upon their release into the community as had been predicted.

CIVIL RIGHTS COMPLAINT

DSH then deliberately deprived these hundreds of individuals, including Plaintiff, of the substantial benefits of outpatient treatment, Defendant failed to train Plaintiff's appointed counsel to either (i) properly investigate the DSH regarding such crucial matters and (ii) file a crucial Motion to Dismiss pursuant to the fatal Fourteenth Amendment violations caused by such behavior of the DSH.

67. Despite the facts, noted above relevant to the Defendant was aware that (i) statutory construction reveals the State of California's Legislature never intended the SVPA to be applied against Plaintiff; (ii) although Petitioner is similarly situated to deportable aliens convicted of *non-sexual* aggravated offenses, unlike such deportable aliens Petitioner was not permitted, upon completion of his prison sentences, to return to his homeland; (iii) the State of California lacked the mandated legitimate state interests to proceed with the SVPA against Plaintiff due to Plaintiff being an illegal deportable alien seeking to return to his homeland[19] and (iv) the ability for the SVPA to be construed as applying to illegal deportable aliens seeking to return to their homelands demonstrates the SVPA is facially overbroad, Defendant failed to train Plaintiff's appointed counsel to either (i) properly file a Demurer due to the SVPA being facially overbroad and (ii) file a crucial Motion to Dismiss pursuant to the fatal Fourteenth Amendment Substantive and Procedural Due Process violations cause by the SVPA being applied against illegal deportable aliens seeking to return to their homelands.

## IV. CLAIM

Plaintiff realleges and incorporate by reference all of the above.

Plaintiff has a claim under 42 U.S.C. §1983 for violations of the following federal constitutional civil rights:

**Violation of the Plaintiff's Procedural and Substantive Due Process Rights, under the Fourteenth Amendment, to not be subjected to an irrational assessment method of determining that Plaintiff is prohibited from taking part in outpatient treatment.**

**Violation of Plaintiff's Procedural and Substantive Due Process Rights, under the Fourteenth Amendment, to not be deprived of adequate treatment.**

**Violation of Plaintiff's right to not be deprived of the benefit of outpatient treatment that those similarly situated are provided with contrary to the Fourteenth Amendment's Equal Protection Clause.**

**Violation of Plaintiff's Substantive Due Process Fourteenth Amendment Right to not be subjected to conditions that are excessively restrictive in relation to their purported purposes.**

**Violation of Plaintiff's Procedural Due Process Rights, under the Fourteenth Amendment, to not be subjected to California legislation despite the California Legislature never intending such legislation to be applied to Plaintiff.**

**Violation of Plaintiff's Procedural and Substantive Due Process Rights, under the Fourteenth Amendment, to not be subjected to California legislation that the state lacks any legitimate interest in subjecting Plaintiff to.**

---

[19] A state has a "legitimate interest [in conducting civil commitment proceedings] under its parens patriae powers in providing care to its citizens who are unable because of emotional disorders to care for themselves [and] authority under its police powers to protect the community from the dangerous tendencies of some who are mentally ill." (*People v. McKee* (2010) 47 C[19]al. 4th 1172, 1188-1189; *Addington v. Texas*, 441 U.S. 418, 426) Plaintiff has conceded deportability and is willing to be escorted to his homeland by law enforcement officials.

**Violation of Plaintiff's Procedural and Substantive Due Process Rights, under the Fourteenth Amendment, to not be subjected to California legislation that is overbroad.**

**Violation of Plaintiff's right to Equal Protection, under the Fourteenth Amendment, to be treated in a similar manner to similarly situated deportable aliens.**

The above civil rights were violated by the Defendant during the entire period, from or about _____2004_____ to present the time Plaintiff was ordered civilly committed pursuant to the SVP when Plaintiff was to have been adequately represented by appointed counsel under the supervision of Defendant due to Plaintiff being deliberately deprived of the adequate and far less restrictive outpatient mental health treatment due to Plaintiff having been deliberately subjected to an "assessment method", which Defendant failed to train and direct Plaintiff's appointed counsel to adequately challenge, despite Defendant firstly knowing the DSH was aware such "assessment method" was irrational and secondly knowing the DSH was aware such "assessment method" was being implemented in a manner to irrationally dramatically increase the projected probability of there being a substantial "likelihood" that Plaintiff would commit a sexually violent predatorial offense if he were to be treated within the community, irrespective of whether he were to be adequately supervised within the community.

**Defendant failed to train and direct Plaintiff's appointed counsel to adequately challenge, the "assessment method" despite Defendant knowing the DSH was aware it had created and acquiesced to policies and customs that the DSH was aware permitted the above-noted Fourteenth Amendment violations, namely: (i) the DSH created and acquiesced to policies and customs which permitted the use of actuarial tools the DSH knew were irrational; (ii) the DSH created and acquiesced to policies and customs to policies and customs which permitted courts of this nation to be misled to believe that such actuarial tools were rational despite the DSH knowing such tools were irrational; (iii) the DSH created and acquiesced to policies and customs to policies and customs which permitted the improper use of "assessment tools" in manners the DSH knew caused irrational increases in the projected probabilities of alleged, and committed, "sexually violent predators" committing sexually violent predatorial offenses if released into the community irrespective of whether he were to be adequately supervised within the community; (iv) the DSH created and acquiesced to policies and customs to policies and customs which permitted such "assessment methods" to exclude the effects of Global Positioning Supervision (GPS) monitoring, which defendants knew would, cause irrational dramatic increases in the projected probabilities of alleged, and committed, "sexually violent predators" committing sexually violent predatorial offenses if released into the community irrespective of whether they were to be adequately supervised within the community; (v) the DSH created and acquiesced to policies and customs that permitted such "assessments" to use invalid data, "base rates" or "groupings" in a manner the DSH knew would cause irrational dramatic increases in the projected probabilities of alleged, and committed, "sexually violent predators" committing sexually violent predatorial offenses if released into the community irrespective of whether they were to be adequately supervised within the community; (vi) the DSH created and acquiesced to policies and customs that the DSH knew would irrationally deprived alleged, as well as committed, "sexually violent predators" of the substantial benefits of outpatient treatment; (vii) the DSH created and acquiesced to policies and customs that required the staff under the supervision of the DSH to deliberately disregard the treatment needs of alleged, and committed, "sexually violent predators" through such staff's acquiescence to such patients' irrationally being deprived of the substantial benefits of outpatient treatment; and (viii) the DSH created and acquiesced to policies and customs that required the staff, under the DSH's supervision, to acquiesce to depriving those patients under their care of the far less restrictive means of meting**

CIVIL RIGHTS COMPLAINT

the purported purposes of California's SVPA, available to such individuals within outpatient settings; (ix) statutory construction reveals the State of California's Legislature never intended the SVPA to be applied against Plaintiff; (x) although Petitioner is similarly situated to deportable aliens convicted of *non-sexual* aggravated offenses, unlike such deportable aliens Petitioner was not permitted, upon completion of his prison sentences, to return to his homeland; (xi) the State of California lacked the mandated legitimate state interests to proceed with the SVPA against Plaintiff due to Plaintiff being an illegal deportable alien seeking to return to his homeland[20] and (xii) the ability for the SVPA to be construed as applying to illegal deportable aliens seeking to return to their homelands demonstrates the SVPA is facially overbroad, Defendant failed to adequately train and supervise Plaintiff's attorney to ensure Plaintiff's attorney to file the required Demurer and Motion to Dismiss.

The facts that support this claim are listed above in IV Statement of Facts

As a result of the Defendant's violations of the above-noted civil rights, Plaintiff was harmed in the following ways:

Plaintiff experienced emotional suffering. Plaintiff was not permitted to begin effective outpatient psychological treatment and Plaintiff was deprived of the increased liberty he would have experienced within an outpatient treatment setting.

## V.  **REQUEST FOR RELIEF**

WHEREFORE, the Plaintiff requests:

1. Declaratory relief in the form of a declaration that the assessment methodology used by the State of California, ostensibly pursuant to its SVPA to determine that individuals may *not* take part in outpatient treatment, (i) is irrational contrary to the Procedural Due Process rights within the Constitution's Fourteenth Amendment, (ii) causes such individuals to be arbitrarily and irrationally deprived of treatment, that those similarly situated are provided with contrary to the Fourteenth Amendment's Equal Protection Clause and (iii) causes such individuals to be subjected to conditions that are excessively restrictive in relation to purported purpose of the SVPA contrary to the Fourteenth Amendment.

2. Declaratory relief in the form of a declaration that the SVPA's application to illegal deportable aliens seeking to return to their homelands violates the Equal Protection Clause, the Procedural Due Process rights within the Constitution's Fourteenth Amendment and the Substantive Due Process rights within the Constitution's Fourteenth Amendment

3. Punitive Damages in the amount of $10,000,000.

Dated: Jan. 22, 2015                                              Respectfully Submitted,

Rodrigo de Conas

*Plaintiff in Pro Se*

---

[20] A state has a "legitimate interest [in conducting civil commitment proceedings] under its parens patriae powers in providing care to its citizens who are unable because of emotional disorders to care for themselves [and] authority under its police powers to protect the community from the dangerous tendencies of some who are mentally ill." (*People v. McKee* (2010) 47 C[20]al. 4th 1172, 1188-1189; *Addington v. Texas*, 441 U.S. 418, 426) Plaintiff has conceded deportability and is willing to be escorted to his homeland by law enforcement officials.

CIVIL RIGHTS COMPLAINT



Douglas Mackenzie
Patient No, 1656-8
Coalinga State Hospital
P.O. Box 5003
Coalinga, CA 93210-5003

✱ LEGAL MAIL ✱

RECEIVED
CLERK, U.S. DISTRICT COURT

FEB - 6 2015

CENTRAL DISTRICT OF CALIFORNIA
BY

neopost
01/23/2015
US POSTAGE
FIRST-CLASS MAIL
$01.61⁰
ZIP 93210
041L11212894

Deputy Clerk of the Court
United States District Court
Central District of California
312 North Spring Street
Los Angeles, CA 90012